**CALIFORNIA APPAREL CREATORS et al.
v. WIEDER OF CALIFORNIA, Inc.,
et al.**

No. 210, Docket 20513.

Circuit Court of Appeals, Second Circuit.
July 30, 1947.

894

L. HAND, Circuit Judge, dissenting.

Max Feingold, of Los Angeles, Cal. (Ezra Grossman, of New York City, and Nathan L. Schoichet, of Los Angeles, Cal., on the brief), for plaintiffs-appellants.

Katz & Heimowitz, of New York City (Simon Katz, of New York City, of counsel), for defendant-appellee Wieder of California, Inc.

Leon Lauterstein, of New York City (Lauterstein, Spiller & Brown and Lincoln W. Lauterstein, all of New York City, on the brief), for defendant-appellee Cortley Shirt Company, Inc.

Fred N. Howser, Atty. Gen. of California, Hartwell H. Linney, Chief Asst. Atty. Gen., and W. R. Augustine, Deputy Atty. Gen. as amicus curiæ in support of the claims of plaintiffs-appellants.

Haight, Trippet & Syvertson and Lyle C. Newcomer, all of Los Angeles, Cal., for Los Angeles Chamber of Commerce, amicus curiæ, in support of the claims of plaintiffs-appellants.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In this appeal we must decide whether or not a group of manufacturers and dealers in wearing apparel located in the State of California may prevent manufacturers and dealers in wearing apparel located in New York from using the names "California" or "Californian" in connection with their businesses. There are 76 plaintiffs, comprising an incorporated trade association and 75 of its members. The defendants are three corporations of New York City—Wieder of California, Inc., California Sportswear, Inc., and Cortley Shirt Company, Inc. Defendant Cortley does not use any variant of the word "California" in its trade name, but it does use the term "Californian" as a brand name for a line of its sportswear and on the labels affixed to such sportswear. Purporting to act not only for themselves, but also for all California manufacturers of wearing apparel, plaintiffs joined together to bring this action for unfair competition against defendants. In it they demanded damages, an accounting for profits, and an order enjoining the defendants from using the word "California" or any variation of it in their trade names or in describing their products. Defendants in their answers counterclaimed for declaratory judgments. Defendants Wieder and Sportswear sought declarations of their rights to continue to use their trade names, and defendant Cortley sought a declaration of its right to use its label and brand name. Plaintiffs moved for a preliminary injunction, and all defendants moved for summary judgment dismissing the complaint and on their counterclaims. The District

Court denied plaintiffs' motion and granted defendants' motions—Wieder's in toto, and those of the other defendants in part. The District Court excepted from its order and preserved for future trial the claim of one of the plaintiffs, California Sportswear Co., against the defendant Sportswear because of similarity of their trade names, and against defendant Cortley because of similarities in their labels. D.C.S.D.N.Y., 68 F.Supp. 499. From this judgment plaintiffs have appealed.

In their complaint and later affidavits submitted to the District Court, appellants maintained that California-made wearing apparel was generally superior in quality and design to that made in all other sections of the country. They argued further that California apparel manufacturers had spent large sums of money advertising their wares and had succeeded in getting this idea accepted by the buying public. The answer and answering affidavits of the defendants challenged these claims and asserted the contrary. As was perhaps inevitable from the nature of the case, the statements on both sides tended in general to be opinions or conclusions of the affiants. rather than basic facts, however vigorously the respective views were advanced or asserted. Defendants claim, however, that whatever weight be given to the assertions on behalf of the plaintiffs, they show no right to relief in the premises; and the District Court was of this view, except for those cases of asserted direct injury to a specific plaintiff by the use of clearly similar names which it reserved for trial.

It is obvious that this presents an interesting and an important issue. The manufacturers of California have so considered it, as shown by the large numbers who have grouped together to enforce these claims as against businesses at so great a distance and seemingly not of nationwide scope. This is shown also by the support given the plaintiffs' plea by briefs amici curiæ by the Attorney General of California and the Los Angeles Chamber of Commerce. On the other hand, the rather far-reaching scope of the plaintiffs' claims is emphasized by the defendants, who suggest the numerous instances of well-known products, such as Manhattan shirts, Palm

Beach suits, and Paris garters, which do not come from the localities indicated. The extent of the change in business practice which a plaintiffs' judgment might forecast may be suggested by an examination of any city directory showing the widely prevalent usage of state and city names by business houses. Thus the New York City telephone directory has seemingly countless such cases, including 40 or more involving California.[1] So far as the consumer is concerned, he is not dependent upon the private remedial actions brought by competitors; for the remedies under the Federal Trade Commission Act, at least as amended in 1938, 15 U.S.C.A. § 45, are now extensive, and are employed by the Commission to prevent misleading of the public as to the origin of an article sold at retail.[2] Here, therefore, we are concerned only with the remedial rights of individual businesses and whether or not such businesses have been damaged by the unfair competition of the defendants.

First we should note the character and capacity of the plaintiffs and the effect of their declaration that they sue on behalf of other California manufacturers similarly affected. Plaintiff California Apparel Creators is a non-profit organization, organized some three months before the institution of this suit, which includes as members 17 associations of wearing apparel manufacturers and their respective members composed in the aggregate of "hundreds of firms manufacturing wearing apparel within the metropolitan area of the County of Los Angeles, California." It as-

serts that it has spent and is spending many thousands of dollars in advertising to create consumer demand for California wearing apparel manufactured and styled by plaintiffs; but it shows no direct interest in itself, such as ASCAP had in the royalties of composers as appeared in Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111. There also appear as plaintiffs 28 individuals, 36 copartnerships, and 11 corporations, or a total of 75 named parties who assert individual wrongs. These plaintiffs claim not only to represent themselves as manufacturers of various types of men's, women's, and children's wearing apparel, with their factories and places of business within the State of California, but also to represent all other California manufacturers who would be similarly affected and as to whom there is a common question of law and fact affecting their rights in the same manner as the rights of the named plaintiffs. Defendants assert that there are upwards of 4,500 such manufacturers in California; and this is not only not denied, but appears to be accepted as fact by the plaintiffs. In other words, the named plaintiffs represent less than 2 per cent of the potential number. There is no showing of the relative value of their investments; the large number of unincorporated businesses among the plaintiffs, considered in the light of American business practice generally, suggests certainly no greater proportionate investment than do the numbers.

 So far as these plaintiffs assume to represent others they can do so only by

---

[1] Here, too, may be noted the widely scattered "New York" or "Boston" stores; there appears to be even a "Boston Store of Chicago" on Sixth Avenue, New York City. Thus in New Haven we find shoe repairing with a Hartford label, furs, furniture and junk, smoked fish, and tailoring labelled "New York," and an inn from Waterbury. Seemingly the taboo claimed by the plaintiffs would extend to a statement of origin of the business man himself, as distinguished from his products; here defendant Wieder of California, Inc., was organized by Samuel Wieder and his wife, as principals; and they had been in the garment business in California until they came to New York in 1944.

[2] See, e.g., Houbigant, Inc. v. Federal Trade Comm., 2 Cir., 139 F.2d 1019, certiorari denied 323 U.S. 763, 65 S.Ct. 116, 89 L.Ed. 611; Etablissements Rigaud, Inc., v. Federal Trade Comm., 2 Cir., 125 F.2d 590; El Moro Cigar Co. v. Federal Trade Comm., 4 Cir., 107 F.2d 429; H. N. Heusner & Son v. Federal Trade Comm., 3 Cir., 106 F.2d 596; Fioret Sales Co. v. Federal Trade Comm., 2 Cir., 100 F.2d 358. See also Federal Trade Comm. v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 532; Federal Trade Comm. v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838.

virtue of subd. (3) of Rule 23(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which has been commonly referred to as granting authority for the so-called "spurious" class suit. None of the requirements of subds. (1) and (2) are fulfilled; and the basis of representation is only, as indeed plaintiffs themselves assert, the existence of common questions of law or fact affecting the several rights. But this is merely a device of permissive joinder of plaintiffs, found unnecessary under state procedures and only helpful in the facilitation of the broad disposition of suits within the confines of federal jurisdiction. It does not grant authority to adjudicate finally rights as to nonappearing parties or to confer any additional substantive rights upon the plaintiffs suing. Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; 2 Moore's Federal Practice 2235-2245, 2291; 46 Col.L.Rev. 818; 55 Yale L.J. 831; cases cited in Clark on Code Pleading, 2d Ed. 1947, 405, 407.[3] Hence the rights of the rest of the 4,500 potential plaintiffs are actually not to be settled here, and we cannot give judgment as though they were. We stress this point because at times there appear to be suggestions that the representative character of a suit may aid in recovery.[4] Of course where there is a true class suit, as in Gibbs v. Buck, supra, the consequences are otherwise; but in this situation there is no safety in potentially greater numbers of property claimants. Indeed, it but serves to accentuate the fundamental weakness of plaintiffs' claim here that the rights claimed are so diffused and attenuated that they do not show convincing reality as to any particular persons.

■ Turning, therefore, to the merits of the claim for unfair competition, we find it of course settled that a geographical name, indicative of the place of manufacture, cannot be appropriated as a trademark. Columbia Mill Co. v. Alcorn, 150 U.S. 460, 464, 14 S.Ct. 151, 37 L.Ed. 1144; Canal Co. v. Clark, 80 U.S. 311, 13 Wall. 311, 20 L.Ed. 581; LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, certiorari denied Lorraine Coffee Co. v. LaTouraine Coffee Co., 329 U.S. 771, 67 S.Ct. 189.[5] But, as plaintiffs contend, a geographical name may acquire a secondary significance which will support an action for unfair competition. Our case concerns that question; we have to see whether or not plaintiffs have such rights in the name of their state that defendants' use thereof is deceptive to their potential customers and causes them injury and loss.

■ In the development of this branch of the law the name or mark acquired its secondary or actionable significance as identification of the source of manufacture of the goods, and hence as showing the origin of the goods. Hence we find the rule so often stated that to establish such a secondary meaning, while it is not necessary to show that the public has become conscious of the personal identity of the manufacturer, yet it must be shown that whatever is asserted to carry the secondary meaning has come to signify origin from a single, though anonymous, source. Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299; Coty, Inc., v. Le Blume Import Co., D.C.S.D.N.Y., 292 F. 264, affirmed 2 Cir., 293 F. 344; Shredded Wheat

[3] So, too, plaintiffs cannot aggregate their claims for the purposes of federal jurisdiction, ibid.; Sturgeon v. Great Lakes Steel Corporation, 6 Cir., 143 F.2d 819, certiorari denied 323 U.S. 779, 65 S.Ct. 190, 89 L.Ed. 622; Central Mexico Light & Power Co. v. Munch, 2 Cir., 116 F.2d 85, a point which would become of importance here in the event of trial, in view of the defendants' denial of plaintiffs' allegations of jurisdiction.

[4] Cf. 2 Callmann, The Law of Unfair Competition and Trade-Marks, 1945, 1415. The statement in 4 Restatement, Torts, 1939, § 761, comment a, is appropriately more guarded, in terms of facility of proof only, viz: "When only

an injunction is sought, the difficulties of proof may be reduced by a joinder of all the actor's competitors as parties plaintiff."

[5] While "most of the issues in the case involve questions of common law," we feel we should say, with Justice Brandeis in a similar situation, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113, n. 1, 59 S.Ct. 109, 111, 83 L.Ed. 73: "But no claim has been made that the local law is any different from the general law on the subject, and both parties have relied almost entirely on federal precedents." Compare discussion by the writer of this opinion in 55 Yale L.J. 267, 282-284.

898

Co. v. Humphrey Cornell Co., 2 Cir., 250 F. 960; Coca Cola Co. v. Koke Co. of America, 254 U.S. 143, 146, 41 S.Ct. 113, 65 L.Ed. 189; cases collected 150 A.L.R. 1092, 1093; 3 Restatement, Torts, 1938, § 715, comment b, § 727, comment a, § 730, comment a. "Indeed," as Judge Learned Hand put it in Bayer Co. v. United Drug Co., D.C.S.D.N.Y., 272 F. 505, 509, "the whole law of 'secondary meaning' is built upon that presupposition." The same idea was expressed recently by the Supreme Court in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, when Justice Brandeis said: "It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." To the same effect are Elgin Nat. Watch Co. v. Illinois Watch-Case Co., 179 U.S. 665, 674, 21 S.Ct. 270, 45 L.Ed. 365, and Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 336, 59 S.Ct. 191, 83 L.Ed. 195.

With the development of more far-flung business enterprises and the wider uses of advertising, it must now be recognized that newer forms of trade deceit may be developed where the literal language of the "single source" rule may not adequately reflect the precedents. This seems particularly the case with reference to certain geographical names where through some combination of circumstances such a name may come to mean in the public mind not a single source, but a number, even though limited, of independent manufacturers or producers. Thus actions have been held maintainable for misrepresentation by appropriation of geographical names where products of the soil of certain localities were, because of climatic or other natural advantages, superior to similar products of other localities, California Fruit Canners' Ass'n v. Myer, C.C.D.Md., 104 F. 82; Harvey v. American Coal Co., 7 Cir., 50

F.2d 832, certiorari denied 284 U.S. 669, 52 S.Ct. 43, 76 L.Ed. 566, or where producers of a particular region, using a peculiar patent or other special process, have produced a product of a single quality whose superiority is generally recognized. Pillsbury-Washburn Flour-Mills Co. v. Eagle, 7 Cir., 86 F. 608, 41 L.R.A. 162, certiorari denied 173 U.S. 703, 19 S.Ct. 884, 43 L.Ed. 1184; Grand Rapids Furniture Co. v. Grand Rapids Furniture Co., 7 Cir., 127 F.2d 245, 138 F.2d 212, certiorari denied 321 U.S. 771, 64 S.Ct. 529, 88 L.Ed. 1066; Douglas v. Newark Cheese Co., 153 Misc. 85, 274 N.Y.S. 406; Schweizerishe Kaese-union Bern v. Saul Starck, Inc., 162 Misc. 485, 293 N.Y.S. 816; Douglas v. Mod-Urn Cheese Packing Co., 161 Misc. 21, 290 N.Y.S. 368. It is but natural that plaintiffs should seize upon such cases as the Grand Rapids Furniture case [6] and contend that its logic should carry as far as all the apparel manufacturers of a large state. But before we discuss the rationale further we should note that none of the cases at all approach the breadth of remedy claimed by plaintiffs. Here there is first the sheer weight of numbers involved as claimants. In addition, there is the combination of factors involving goods having no apparent or obvious connection with the locality and manufacturers of all different forms of apparel for both men and women from jewelry, through under and outer garments, to hats, [7] coupled with the conceded facts that they have no definite standards of quality or grading. Moreover, it appears that the semifinished materials and goods which go into the finished products come from other parts of the country, including New York; and this seems to be true, with respect to some of the manufacturers at least, even as to the articles themselves—as defendants assert and plaintiffs can hardly deny in the absence of any adequate policing of their

[6] This case probably goes as far as plaintiffs interpret it, though secondary significance was assumed, rather than discussed, and the first-named plaintiff was in any event entitled to relief against appropriation of its entire trade name by defendant.

[7] Differences in the products of plaintiffs and defendants were held to justify denial or limitation of relief in S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427; Durable Toy & Novelty Corporation v. J. Chein & Co., 2 Cir., 133 F.2d 853, certiorari denied 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849; Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347.

various businesses. Further, the plaintiffs can lay no claim to long enjoyment of the public's good will. As they concede, their extensive advertising is only a matter of recent development, with their trade association organized only just before the bringing of this action.

It is true that on the basis of the cited cases some text writers have asserted a general expansion of the law, though others have pointed out the dangers of monopoly inherent in the expansion of property concepts in names beyond the deceit of the public and the public interests advanced by free competition.[8] Discussion has centered about the meaning and continued vitality of two early and leading cases. In New York & R. Cement Co. v. Coplay Cement Co., C.C.E.D.Pa., 44 F. 277, 10 L.R.A. 833, rehearing with memorandum, C.C., 45 F. 212, the plaintiff was one of several cement manufacturers located at Rosendale, N. Y., who marketed their products under the name of "Rosendale Cement." The defendant manufactured cement elsewhere and sold it as Rosendale cement. Mr. Justice Bradley, sitting on circuit, applied the single-source rule strictly to defeat the plaintiff's claim of unfair competition. This case was cited with approval and even pressed further in American Washboard Co. v. Saginaw Mfg. Co., 6 Cir., 103 F. 281, 50 L.R.A. 609, distinguished by the high authority of the bench then sitting, with Day, J., writing the opinion with the concurrence of Judges Taft and Lurton. Here the court refused to enjoin defendant from representing its zinc washboards as "Aluminum" at the suit of plaintiff, the sole manufacturer of washboards with aluminum rubbing surfaces, holding that plaintiff had not established its use of the name prior to defendant's, could not sue merely for deceit of the public, and failed because it did not show direct loss of customers or direct injury to itself.

These cases of course are authorities against the plaintiffs' claims; but we need not go so far or decide to what extent they still represent the law.[9] For we have precedents more direct and more apt from this circuit and from the Supreme Court. In Ely-Norris Safe Co. v. Mosler Safe Co., 2 Cir., 7 F.2d 603, Judge L. Hand, in discussing the Coplay Cement case, pointed out that it did not appear that the plaintiffs were the only persons making cement at Rosendale. He continued: "There was no reason, therefore, to assume that a customer of the defendant, deceived as to the place of origin of the defendant's cement, and desiring to buy only such cement, would have bought of the plaintiffs. It resulted that the plaintiffs did not show any necessary loss of trade through the de-

[8] See of the former type: 1 Callmann, The Law of Unfair Competition and Trade-Marks, 1945, 243; Callmann, He Who Reaps where He Has Not Sown: Unjust Enrichment in the Law of Unfair Competition, 55 Harv.L.Rev. 595; Derenberg, Trade-Mark Protection and Unfair Trading, 1936, 81-85, 94-96; Nims, The Law of Unfair Competition and Trade-Marks, 3d Ed. 1929, 289; but compare Zlinkoff, Monopoly versus Competition: Significant Trends in Patent, Anti-Trust, Trademark, and Unfair Competition Suits, 53 Yale L.J. 514, 529; Eastern Wine Corporation v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 957, certiorari denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452; S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427, 429; and acute discussion by Chafee, Unfair Competition, 53 Harv.L. Rev. 1289, 1305, 1312, 1317-1321. The discussion by Handler, False and Misleading Advertising, 39 Yale L.J. 22, is referred to below; and see also Handler, Unfair Competition, 21 Iowa L.Rev. 175; Grismore, Are Unfair Methods of Competition Actionable at the Suit of a Competitor, 33 Mich.L.Rev. 321.

[9] In addition to the criticisms cited in note 8, supra, reference may be made to the Reporter's Explanatory Note to Restatement, Torts, Proposed Final Draft No. 2, 1939, 178-181, and cf. City of Carlsbad v. Tibbetts, C.C.D.Mass., 51 F. 852, 856. But the text writers accept these cases as not overruled and as law, with such modification as is suggested by Mosler Safe Co. v. Ely-Norris Safe Co., 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578, discussed below. Derenberg, Trade-Mark Protection and Unfair Trading, 1936, 94; 1 Callmann, The Law of Unfair Competition and Trade-Marks, 1945, 243, 245; Callmann, What Is Unfair Competition? 28 Geo. L.J. 585; and see also Hall v. Duart Sales Co., D.C.N.D.Ill., 28 F.Supp. 838.

fendant's fraud upon its own customers." [10] Further he stated the issue as follows: "While a competitor may, generally speaking, take away all the customers of another that he can, there are means which he must not use. One of these is deceit. The false use of another's name as maker or source of his own goods is deceit, of which the false use of geographical or descriptive terms is only one example. But we conceive that in the end the questions which arise are always two: Has the plaintiff in fact lost customers? And has he lost them by means which the law forbids? The false use of the plaintiff's name is only an instance in which each element is clearly shown." 2 Cir., 7 F.2d 603, 604. Finding that the plaintiff had alleged a monopoly from which the inference of loss of customers followed, he reversed the dismissal below.

While this decision was in turn reversed by the Supreme Court, Mosler Safe Co. v. Ely-Norris Safe Co., 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578, it was done on the ground that in this case, also, no exclusive right was shown by the plaintiff. The plaintiff had a patent on an explosion chamber in a safe as protection against robbery. But as Justice Holmes points out, it was consistent with every allegation in the bill that there were other safes with explosion chambers besides that for which the plaintiff had a patent. Hence there appeared nothing to prevent the defendant from making a representation that its safes had an explosion chamber if the representation was true. He continued: "If on the other hand the representation was false as it is alleged sometimes to have been, there is nothing to show that customers had they known the facts would have gone to the plaintiff rather than to other competitors in the market, or to lay a foundation for the claim for a loss of sales." 273 U.S. 132, 134, 47 S.Ct. 314, 71 L.Ed. 578.

This decision and the implication from the two opinions, construed together, have been widely accepted as prevailing law. [11] They constitute significant emphasis upon the need of individualizing the injury asserted, and thus point to the weak element of the plaintiffs' case here. To recover damages or to receive protective relief against the actions of these defendants, plaintiffs must therefore show not only a representation by defendants which is false and deceitful in the sense of luring customers to their doors wrongfully, but also that plaintiffs have lost their own rightful custom thereby. This is a grant of summary judgment, and hence we must accept as facts those which the plaintiffs show they intend in good faith to prove. They must, however, disclose in their affidavits what they do intend to rely upon. Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469. In this case the affidavits even suggest certain difficulties as to proof of the deceitful character of the representations here made. [12] Thus there may well be substantial doubt as to the tendency to

---

[10] He made the point yet clearer by pointing out that the American Washboard case was not thus to be distinguished, for there the plaintiff had a monopoly of the metal for the articles in question and it was "a fair inference" that any customer of the defendant, deceived by the latter, was a presumptive customer of the plaintiff.

[11] Authorities are cited in notes 8 and 9, supra. Particularly important is Professor Handler's analysis in 39 Yale L. J. 22, 41, pointing out that the Court impliedly rejected the view that "a tradesman is entitled to injunctive relief where the misrepresentations are calculated to injure the good will of the trade and to discredit the product." Mr. Handler also suggests a possible fourth view, also not accepted by the Court, namely, that of "vicarious avenger of the public," which is now the role of the F. T. C., note 2, supra.

[12] The Trade-Mark Act of 1920 gave a remedy in favor of persons of the locality against any person who wilfully or with intent to deceive affixed to any article "a false designation of origin." 15 U.S.C.A. § 123. This is said to have been a dead letter because of the difficulties of proof; at any rate, the Lanham Trade-Mark Act of July 5, 1946, makes two important changes, in that it omits the requirement of willfullness or intent to deceive and extends the liability "to a civil action" by "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." § 43(a), 15 U.S.C.A. § 1125(a). This is not applicable here, since the Act did not become effective until July 5, 1947, after the argument

deceive of "California shirts" made by a New York manufacturer. Nevertheless, in view of the countervailing claims, we agree that this is a matter not properly disposed of on summary judgment. But the question of injury to the plaintiffs is now important. And the fact of injury seems to us clearly not shown, and, indeed, incapable of being shown, in view of the other circumstances in this case of the thousands of other California manufacturers and of the absence of any general and definite standards of quality applied to the plaintiffs and their local competitors or shown to be infringed by these three local New York concerns.

It is nowhere claimed that there is, or will be, available any proof of specific customers diverted from specific plaintiffs through the actions of these defendants. The only possible suggestion of injury is by a strained process of inference, as by the suggested conclusion that the general effect of defendants' actions must have diverted customers from the plaintiffs. Here we are met with the direct difficulty found insurmountable by Justice Holmes in the Ely-Norris Safe Co. case, that there is no reason to assume that defendants' customers, deceived as to the place of origin, would otherwise have bought of these plaintiffs. Not only are these plaintiffs a small portion of the total California manufacturers, but they do not even appear to be large manufacturers themselves or to control any considerable portion of the California business. The reasons which led the Supreme Court to dismiss the bill in that case on its allegations are therefore more pertinent here, where the limited extent of the plaintiffs' share of the total business definitely appears and is not merely a matter of inference, as there.

True, the complaint here contains, in addition to the general allegations of superiority of the California clothes, certain general allegations that the inferior character of the defendants' clothes injures the reputation of California clothes. But no attempt is made to support these conclusory statements in the affidavits and it is clear that they cannot be supported. Some of the various affiants do make the general claims of superiority of manufacture of the California goods which we have noted, but they also show the absence of definite standards of quality and assert only a group pressure to produce goods of high quality. By the very form of their statements they show that there are necessarily deviations in quality in their own group which are more natural sources of injury to the other manufacturers in California than this distant and only potential New York competition. Were such injury by deleterious quality directly charged by specific and comparative facts, we would still be thrown back, however, on the question of lack of showing of loss to these particular plaintiffs, out of all the California manufacturers who conceivably might be injured. In other words, the difficulty found in the Ely-Norris case [13] still exists in much more pointed fashion than it did there.

■ The grant of the summary judgment was therefore appropriate to the extent ordered by the court. The claim that the plaintiffs were not given enough time to gather and submit affidavits was properly denied in the discretion of the court. They had had reasonably full opportunity to produce affidavits, and it was clear that the further ones sought were merely cumulative. Indeed, the affidavits do not reach

---

of this appeal, and does not apply to pending cases, § 46(a), set forth in note to 15 U.S.C.A. § 1051. The amendment is expected to produce a more effective remedy, Robert, The New Trade-Mark Manual, 1947, 186-188; Callmann, The New Trade-Mark Act of July 5, 1946, 46 Col.L.Rev. 929, 931, although Mr. Derenberg states it perhaps more judiciously as codifying the doctrine of the Grand Rapids case. Derenberg, Preparing for the New Trade-Mark Law, Analysis 50, Research Inst. of America, 1947, 6. As applied to a situation such

as here disclosed, there is of course the necessity of proving that the apparel labels do designate the origin of the goods to the buyers, and there is the further problem as to the rather curious and ambiguous wording of the statute creating liability to an action (query: Does this mean judgment, and if so, for what?) in favor of a quite indefinite number of volunteer plaintiffs. How far this may change the effect of the Ely-Norris Safe Co. case must therefore await further elucidation.

[13] See note 11, supra.

the really crucial issues as disclosed by the Ely-Norris case.

■ In so far as the judgment appealed from finally adjudicates claims of all the plaintiffs except the California Sportswear Co., it is a final and appealable judgment. In so far as it preserves the claims of that plaintiff against Cortley and Sportswear, it is not final and hence not appealable. But, as we have seen, the claims of each of the plaintiffs against each of the defendants were separate claims which could be litigated together only because of the permissive joinder provisions of the new rules. See Rules 20(a), 23(a) (3), F.R.C.P. The retention of some for trial, therefore, in no way affects the appealability of a judgment disposing of others. Rule 54(b), F.R.C.P.; Reeves v. Beardall, 316 U.S. 283, 62 S.Ct. 1085, 86 L.Ed. 1478.

Judgment affirmed except as to those portions preserving for trial the claims of California Sportswear Co. against Cortley Shirt Company, Inc., and California Sportswear, Inc. As to those portions, appeal dismissed.

L. HAND, Circuit Judge (dissenting):.

As I understand my brothers, they do not dissent from the doctrine, which we laid down in Ely-Norris Safe Co. v. Mosler Safe Co.,[1] and which the Supreme Court did not disturb upon the appeal, though they disagreed with our reading of the bill of complaint.[2] That doctrine is that it is untrue to say that a person aggrieved can never have protection against a competitor's false attribution of geographical origin to his goods, or his false description of their quality or character. We held that such false advertising will always be an actionable wrong, if the plaintiff can show that it has in fact diverted customers from him. The plaintiffs' difficulty in the case at bar, if it ever came to trial, would be to show that the defendants' attribution to their goods of a false geographical origin did divert customers from them. That would be indeed difficult to prove, so difficult that, if it were necessary in addition to prove how much

any one of them had lost in dollars and cents, I think I should go along with the decision we are making. However, it would not be necessary for them to make that proof in order to get an injunction; personally I should be satisfied, if any one of them proved that the defendants' advertisements had diverted, or would divert, his customers. If he did so, I should enjoin the defendants from continuing to get customers that way, just as I should enjoin them from getting customers by any other fraud.

Moreover, I should go further. This, I agree, is a "spurious" class action under Rule 23(a) (3); I also agree that the California Apparel Creators Inc. has no standing to complain. However, there are seventy-five individual merchants who have joined as plaintiffs; and it well may be that collectively they could prove that some of them must have lost, or were losing, customers by the advertisements, although they could not identify the individual sufferers. That would be enough to my mind to support an injunction in favor of all the seventy-five against the defendants; and my justification is this. By hypothesis the defendants are injuring some one or more of the group; and he or they would get an injunction, if they could be ascertained; the others are not so entitled only because they have not been able to prove that they do not as yet need one. Faced with a choice between denying any remedy to those to whom a remedy is due, and extending it to those who do not need it, I should not hesitate. It seems to me that the joinder now allowed under Rule 23(a) (3) may, and should, be read to accomplish such a change in addition to allowing several actions to be tried at once.

We are affirming a summary judgment cutting off the plaintiffs from any trial because they have not been able in their affidavits to make out a prima facie case. I cannot agree to that. In trials of this kind the issues are as vagrant and vague almost, if not quite, as in prosecutions under the Anti-Trust Acts. In all cases where the fraud is not stark and bare, the issue tried is

---

[1] 7 F.2d 603.

[2] 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578.

how an indefinite number of unknown and unascertainable buyers will understand a false advertisement or label. It is the last kind of action in which to invoke the remedy of summary judgment. Indeed, when I see, as I am constantly seeing more and more, the increasing disposition to make use of that remedy, I cannot help wondering whether there is not danger that it may not rather impede, than advance, the administration of justice. It is an easy way for a court with crowded dockets to dispose of them, and the habit of recourse to it readily becomes a denial of that thorough, though dilatory, examination of the facts, on which justice depends even more than upon a studious examination of the law; for a mistake of law can always be reviewed. Speed and hurry ought to be antipodes of judicial behavior.